1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8
9
10

| | |
|---|---|
| CALVIN MALONE, et. al., | CASE NO. 16-5284 RJB |
| Plaintiffs, | ORDER ON MOTION FOR SUMMARY JUDGMENT |
| v. | |
| MARK STRONG, BILL VAN HOOK, DEPARTMENT OF SOCIAL AND HEALTH SERVICES, STATE OF WASHINGTON, | |
| Defendants. | |

17      This matter comes before the Court on Defendants' Motion for Summary Judgment.  Dkt.

18  176.  The Court has considered the pleadings filed in support of and in opposition to the motion,

19  oral argument heard on August 17, 2023, and the file herein.

20      In this case, the Plaintiffs, 219 residents at Washington's Special Commitment Center

21  ("SCC"), a facility for those detained or civilly committed as sexually violent predators, allege

22  that the water quality at the facility violates their Eighth and Fourteenth Amendment rights.  Dkt.

23  82.  They seek damages, prospective injunctive relief, and attorneys' fees and costs.  *Id.*

24

The Defendants now move for summary judgment.  Dkt. 176.  The Plaintiffs concede that, as people who are not prisoners but are civil detainees, their claims regarding water quality should be analyzed under the Fourteenth Amendment and agree that their Eighth Amendment claims should be dismissed.  Dkt. 189.  Accordingly, the Defendants' motion for summary judgment on the Eighth Amendment claim should be granted and that claim dismissed.  The Plaintiffs otherwise oppose the motion for summary judgment.  *Id.*  For the reasons provided below, the remainder of the Defendants' motion for summary judgment (Dkt. 176) should be denied, in part, and granted, in part.

## I.   <u>PROCEDURAL HISTORY, RELATED CASE, AND FACTS</u>

### A.  PROCEDURAL HISTORY AND RELATED CASE

On April 14, 2016, Plaintiff Malone and 26 other SCC detainees filed this case, *pro se*, asserting that they were being harmed by the water quality at the facility.  Dkts. 1-27.  They initially moved to proceed as a class action, which was denied.  Dkts. 28, 31 and 36.  The Court appointed counsel and after several more cases regarding the water at the SCC were filed, the Court consolidated those cases into this case.  Dkts. 40 and 54.

This series of cases followed *Jones v. Special Commitment Center,* U.S. Dist. Court for the Western Dist. of Wash. case number 3:14-cv-5018 BHS.  Filed on January 8, 2014, in *Jones,* the plaintiff claimed, in part, that the water quality at the SCC violated his Fourteenth Amendment rights.  *Jones v. Special Commitment Center, et. al.,* U.S. Dist. Court for the Western Dist. of Wash. case number 3:14-cv-5018 BHS.  *Jones* named as defendants the SCC and a Defendant here, Mark Strong, as well as others.  *Id.*  Another judge in this district granted the defendants' motion for summary judgment of dismissal.  *Id*. at Dkt. 40.  On March 3, 2016,

the Ninth Circuit Court of Appeals reversed the decision as it related to water quality claims at

the SCC, finding that Jones raised issues of fact as to whether Strong violated his Fourteenth

Amendment rights.  *Jones v. Special Commitment Center, et. al.,* 644 Fed. Appx. 721 (9th Cir.

2016).  The Ninth Circuit Memorandum in *Jones* stated that:

> The record contains evidence showing that the water in Jones' housing unit was
> often brown, had floating debris, and at least once, caused Jones and another
> detainee gastrointestinal distress and vomiting. . . . Jones also submitted evidence
> showing that staff occasionally told detainees not to use the water and passed out
> water bottles, and Strong did not address Jones' concern that he was unable to
> shower, wash, or shave.

*Jones* at 721–22.  The Mandate was issued on March 28, 2016, and the *Jones* case was remanded

the district court for further proceedings.  *Id.*  Jones died in November of 2016 and his case was

dismissed without prejudice.  *Jones v. Special Commitment Center, et. al.,* U.S. Dist. Court for

the Western Dist. of Wash. case number 3:14-cv-5018 BHS, Dkts. 69 and 74.

    The Circuit opinion in *Jones* was issued "Not for Publication," but nevertheless, it is a

strong indication of the Ninth Circuit's view of the necessary facts to carry a similar case

forward.

    After *Jones* was dismissed, more SCC detainees joined this case, and there are now 219

Plaintiffs.  Defendants in this case are Mark Strong, the former CEO of the SCC, who resigned

on April 22, 2016, and Bill Van Hook, the current CEO of the SCC, Washington's Department

of Social and Health Services ("DSHS"), and the State of Washington.  Dkt. 82.

**B.  FACTS**

    The following fact section contains opinions from various experts offered by the parties.

In their reply, the Defendants attack the Plaintiffs' experts opinions.  Dkt. 201.  For purposes of

the motion for summary judgment only, the undersigned finds that those opinions are adequate to

be considered on summary judgment.  The parties should not assume that this ruling will apply at trial.

      1.  <u>Drinking Water Law and Standards</u>

      Drinking water in Washington is governed by both federal statutes and regulations (*see e.g.* Safe Drinking Water Act, 42 U.S.C. § 300f, *et. seq.*;[1] 40 C.F.R. § 141-142, *et. seq.* (national primary drinking water regulations) and 40 C.F.R. § 143 (national secondary drinking water regulations)) and state statutes and regulations (*see e.g.* RCW 43.20.050 (vesting Washington's Department of Health with the power and duty to regulate drinking water); Washington Administrative Code 246-290, *et. seq.*).  Federal primary drinking water regulations are standards that have been implemented to protect public health.  Dkt. 181 at 3.  For example, primary drinking water regulations target contaminants that are disinfection byproducts ("DBPs") that can form during the disinfection of water (usually with chlorine); DBPs include trihalomethanes ("TTHM") and five haloacetic acids ("HAA5").  *Id.*  Secondary drinking water standards are guidelines for water's aesthetic characteristics such as taste, odor, and color.  *Id.*  The U.S. Environmental Protection Agency ("EPA") sets a "Maximum Contaminate Level Goal," which "is the level of a contaminant in drinking water below which there is no known or expected risk to health;" the "value is health-based," "intended to be health protective," and exceeding the value "increases the potential for adverse health effects."  Dkt. 191 at 2.  In addition to incorporating the federal standards, Washington has minimum reporting levels of contaminates in drinking water.  *Id.*

---

[1] The federal Safe Drinking Water Act establishes a federally mandated, state-administered regulatory scheme; the federal government sets the minimum standards and states are enabled, with federal approval, to create their own programs and set additional standards.  *See* 42 U.S.C. §§ 300h-h7.

2.   The SCC and the Water Drinking System at Issue

The SCC is located on McNeil Island, Washington in the Puget Sound waterway.  Dkt. 181 at 1.  The McNeil Island Correction Center was also located on McNeil Island, but was closed in 2011.  *Id.*

Prior to the Correction Center's closure, the island's water system provided water to around 2,350 people.  Dkt. 181 at 1.  The water system was flushed (water was sent through the system at a high velocity) four times a year.  Dkts. 180 at 1 and 181 at 1.  Residents were sent notices before each scheduled flushing, asking them not to wash clothes, and were provided bottled water for drinking until the water was clear again.  Dkt. 180 at 1-2.

By 2014, the water system provided water to only 421 people.  Dkt. 181 at 1.  As a consequence, the demand on the water system was reduced.  *Id.*  Velocities in the water system were decreased.  *Id.*  The reduction in demand increased the age of the water and increased sediment collection in the pipes.  *Id.*

To make up for the lost velocity, the water system's operators increased the frequency of flushing.  Dkt. 181 at 1-2.  Flushing removes sediment and deposits and decreases water age in the distribution system.  *Id.* at 2.  As a consequence, water during flushing can appear brown.  *Id.*

At times, the SCC would have a brown water event that was not related to a scheduled flushing.  Dkt. 180 at 2.  When a brown water event occurred, staff would again pass out bottled water and ask residents not to wash clothes until the water was clear.  *Id.*

The Defendants' expert Damon Roth, P.E., contends that "water was confirmed to meet primary drinking water standards during [brown water] events," and asserts that "[n]o drinking water violations were associated with the 'brown water' events."  Dkt. 181-1 at 3.

As is relevant here, water quality testing (at least prior to November 2022 when the water

1   system was renovated) was done quarterly at various sites in the distribution system.  Dkt. 181 at

2   3.  For most contaminants, averages were calculated annually.  *Id.*

3          According to Plaintiffs' expert Lisa Corey, Ph.D.'s review of the historical data (from

4   1985 to 2020) on water quality at the SCC, there were "occasional exceedances of chemicals

5   during the years of sampling" and "chemicals that were routinely elevated above guidance and

6   reporting levels."  Dkt. 191 at 1.  She notes those chemicals were iron, manganese and TTHMs.

7   *Id.*

8          On October 16, 2014, the Department of Health conducted a Sanitary Survey of the

9   McNeil Island water system and opened an enforcement action against it.  Dkt. 177-3.  A

10  December of 2014 testing of the water system revealed a primary drinking water regulated

11  contaminant, a TTHM, that exceeded the allowable limit.  Dkt. 181 at 4.  It was calculated to be

12  .087 mg/L and the allowable limit is .08 mg/L.  *Id.* at 3.  According to the Defendants' expert,

13  Damon Roth, P.E., health risks associated with TTHM result from long-term exposure, not a

14  single exposure.  Dkt. 181 at 4.  He opined that the "increase of TTHM correlate[d] with a drop

15  in the removal of total organic carbon at the water treatment plant in 2014 and the reduction in

16  the population served."  *Id.*  Roth states that as a result of these tests findings, system flushing

17  was increased, closer monitoring occurred, unneeded portion of the system was isolated, a tank

18  was cleaned, and the system's maintenance system was improved.  *Id.* at 4-5.

19         The Department of Health conducted site visits in 2015 and the Department of

20  Corrections worked with an outside engineering firm to try to address the issues with the water

21  system.  Dkt. 181-1 at 11.  In October 2015, the Department of Health and Department of

22  Corrections entered into an Agreed Notice of Correction regarding the water system.  *Id.* at 8-9.

23

24

1    A June 8, 2016, test revealed that the level of manganese exceeded the standards set.

2    Dkt. 181 at 4; 181-2 at 2.  At one sample location the level of manganese was 1.70 mg/L and it

3    was 0.15 mg/L at another sample location.  *Id.* Manganese is a contaminant regulated by the

4    secondary drinking water standards (which generally relate to water aesthetics).  *Id.*  High levels

5    of manganese may be linked to brown water.  *Id.*  According to the Defendants' expert, Damon

6    Roth, P.E., "the measured levels of manganese in the samples collected on June 8, 2016 are

7    likely related to the brown water events that have been documented to occur in this water

8    system." Dkt. 181 at 4.  Roth acknowledges that the EPA has established "health advisory levels

9    of 0.3 mg/L for adults (based on lifetime exposure) and 1.0 mg/L for adults (1-day and 10-day

10   exposure)," but insists that it "does not currently regulate manganese as a primary drinking water

11   contaminant."  *Id.*  Dr. Corey, the Plaintiffs' expert, contends that the EPA's health advisory

12   level "for manganese is health-based and is based on an analysis of the health hazard and

13   aesthetic concerns with manganese consumption."  Dkt. 191 at 3.

14   In July 2016, various state enforcement agencies, including the Department of Health,

15   met with the Department of Correction (who was still managing the SCC's water system) to

16   discuss issues facing the aging system.  Dkt. 181.  The State began developing a new

17   groundwater source system, which included "new water wells, pump houses, water mains, and

18   infrastructure to replace the existing system, which was a surface water system that treated water

19   stored in [a reservoir], . . . with a system that utilized a groundwater source well." Dkt. 179 at 2.

20   The new system became operational on November 18, 2022.  *Id.*.

21   Prior to the new water system becoming operational, on October 26, 2020, the Plaintiffs'

22   expert, Lisa M. Corey, Ph.D., conducted a drinking water quality test at six different locations at

23   the SCC.  Dkt. 191 at 1-2.  The locations tested included the kitchen, laundry room, and a

restroom.  *Id.* at 14-15.  According to Dr. Corey, the testing indicated that levels of iron, manganese, water hardness, several of the TTHMs and two of the HAA5s were "elevated above state reporting levels in drinking water."  *Id.* at 1-2.  Further, one of the HAA5s "exceeded the EPA Maximum Contaminant Level Goal . . . in five of the six sampling locations."  *Id.*  Again, according to Dr. Corey, exceeding a Maximum Contaminant Level Goal "increases the potential for adverse health effects."  *Id.* at 2.  Defendants' expert, Damon Roth, P.E., contends that the "data collected during the [October 2020] testing indicated that all samples were compliant with primary drinking water standards and within the range of what would be considered acceptable for any municipal water system in the United States."  Dkt. 203 at 2.

### 3. Plaintiffs' Complaints Regarding the Water and the Parties' Medical Experts

Plaintiff Calvin Malone, who was a SCC resident from 2012 to 2019, states that there were "frequent" brown water events.  Dkt. 194 at 1.  Plaintiffs Arthur Smith and Sen Witan, who were also residents at the SCC, agree that there were frequent brown water events while they were there.  Dkts. 195 at 1 and 196 at 1.  Malone, Smith, and Witan contend that "sometimes the water was as dark as dark coffee" and "frequently had debris and sediment floating in it."  Dkts. 194 at 1-2; 195 at 1-2; and 196 at 1-2.  They maintain that they were forced to wash their hands and face, brush their teeth, and bathe with the brown water. Dkts. 194 at 1-2; 195 at 1-2; and 196 at 2.  They assert that in order to make coffee or make a microwavable meal, they had to use the brown water.  *Id.* While acknowledging that bottled water was usually given out, they assert that they only received one or two 16.9 ounce bottles.  *Id.*  They claim that sometimes they were not given any bottled water.  *Id.*  They contend that the staff did not drink the tap water and brought water for themselves from off the island.  *Id.*  Malone asserts that drinking the brown water or brushing his teeth with it caused stomach discomfort and vomiting.  Dkt. 194 at 2.  Smith

contends that using the brown water caused stomach discomfort, vomiting, and cramps.  Dkt. 195 at 2.  Witan asserts that drinking the brown water or brushing his teeth in the water caused stomach discomfort and that "the discomfort is ongoing."  Dkt. 196 at 2.  Malone, Smith, and Witan maintain that the water caused skin and eye irritation, tasted "foul, dirty," and smelled badly.  Dkts. 194 at 2; 195 at 2; and 196 at 2.  Malone and Smith contend that the water "left a residue in [their] mouth after swallowing."  Dkts. 194 at 2 and 195 at 2.

The other Plaintiffs claim that they have suffered various injuries as a result of the water.  *See* Dkt. 193.  For example, a total of 153 of the Plaintiffs complain that they have suffered general skin related issues as a result of the water at the SCC (Dkt. 193 at 13) and 170 attribute general gastro-intestinal issues related to the water (Dkt. 193 at 22).  Exhibit 193, however, should not be considered as proof of the alleged injury and harm, because that information is offered in Docket Number 193 as hearsay, and can only be considered here as proof that the listed complaints were made.  Defendants complain about the lack of proof of injury.  In view of the complex nature of 219 plaintiffs, the Court should accept the showing, but without prejudice to efforts to further pinpoint the details of proof to be offered at trial.

The Defendants offer the expert opinion of Paul Darby, M.D., who states that he conducted a review of the medical records of more than 236 SCC residents and Roth's report and concluded that (1) no actual dose of TTHM to a plaintiff could be calculated based on the documents reviewed, (2) "threshold doses of TTHM to disease causation have not been established with any certainty," (3) while there were several cancer cases, none were related to exposure to TTHM, and (4) the elevated level of manganese found on June 8, 2016 "was nonthreatening for human health."  Dkt. 178 at 2-3.

1    The Plaintiffs' expert, Megan Quinn, M.D., contends that Dr. Darby's opinion is too

2  limited in scope and states that "[a]ccording to the EPA, chronic exposure to water containing

3  DBPs [TTHM is a subset of DBP] in excess of established MCLs may lead to cancer, . . . liver,

4  kidney, and/or central nervous system disease.  Animal studies have demonstrated that exposure

5  to DBPs can cause diarrhea and skin irritation."  Dkt. 192 at 5.  She further points out that

6  "[m]ore recent evidence shows associations of TTHM exposure with cardiac and hepatotoxicity,

7  type 2 diabetes . . ." *Id.* (*internal citation omitted*).  She notes that "TTHMs (as well as other

8  DBPs) are volatile and skin permeable, the exposure pathways are numerous, and include

9  ingestion of water, inhalation and skin absorption while showering, bathing and swimming in

10  treated pools . . ."  *Id.* at 9.  Dr. Quinn opines that the drinking water before the system was

11  remodeled "was substandard and via many routes of exposure, SCC residents and staff were

12  exposed to contaminants and elements which, on a more probable than not basis, caused

13  subacute and chronic adverse health consequences . . . including stomach ailments, skin rash and

14  skin irritation."  *Id.* at 12.

15    Dr. Darby, the Defendants' expert, offers a rebuttal opinion that maintains that his

16  analysis was proper and that Drs. Quinn and Corey's opinions were flawed.  Dkt. 202.

17    4.  Resident Grievances and SCC Staff Discussions Around Water Quality

18    In addition to medical complaints about the water quality at the SCC, the Plaintiffs point

19  out that it has been an issue for years.  For example, on January 2, 2013, SCC resident Scott

20  Jones filed a grievance which stated, in part:

21        For months now . . . the water has been bad, for at least 3 months now, it has been
         brown in color, we have to boil it before we can even think about drinking it, and
22        then we have to filter it [which costs a lot of money that, some of us just don't
         have] just to get it drinkable!  The staff are told to bring their own water, so that
23        tells us a whole lot.

24

1   Dkt. 190 at 11.  By way of further example, James Jones, the man who filed *Jones v. Special*

2   *Commitment Center, et. al.,* U.S. Dist. Court for the Western Dist. of Wash. case number 3:14-

3   cv-5018 BHS, filed a grievance on November 14, 2013, that stated, in part:

4          I'm grieving the "living condition" here at the SCC.  Since I have been here,
       2/22/13, the water/system has become contaminated and unusable on at least 3
5          occasions.  When this happens staff passes out bottled water and post signs in the
       unit saying do not drink or use the water.  That means no shower, washing or
6          shaving for up to 24 hours or more.

7   Dkt. 190 at 14.  The staff at the SCC discussed the brown water in emails and at meetings.  *See*

8   *e.g.* 190 at 12-13; 19-30; 34-42.  In a March 16, 2015 email, Cathi Harris, the SCC's Chief of

9   Residential Life, acknowledged that "[h]aving water discoloration and handling the situation is

10  something we do very well here.  We have a lot of practice." Dkt. 190 at 32.

11                                  **II.    <u>DISCUSSION</u>**

12  **A.  SUMMARY JUDGMENT STANDARD**

13          Summary judgment is proper only if the pleadings, the discovery and disclosure materials

14  on file, and any affidavits show that there is no genuine issue as to any material fact and that the

15  movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56 (a). The moving party is

16  entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

17  showing on an essential element of a claim in the case on which the nonmoving party has the

18  burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).  There is no genuine issue

19  of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find

20  for the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

21  (1986)(nonmoving party must present specific, significant probative evidence, not simply "some

22  metaphysical doubt.")  Conversely, a genuine dispute over a material fact exists if there is

23  sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve

24

1   the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986);

2   *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987).

3          The determination of the existence of a material fact is often a close question.  The court

4   must consider the substantive evidentiary burden that the nonmoving party must meet at trial –

5   e.g., a preponderance of the evidence in most civil cases.  *Anderson* at 254; *T.W. Elec. Serv.* at

6   630.  The court must resolve any factual issues of controversy in favor of the nonmoving party

7   only when the facts specifically attested by that party contradict facts specifically attested by the

8   moving party.  The nonmoving party may not merely state that it will discredit the moving

9   party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim.

10  *T.W. Elec. Serv.* at 630. Conclusory, non-specific statements in affidavits are not sufficient, and

11  "missing facts" will not be "presumed."  *Lujan v. National Wildlife Federation*, 497 U.S. 871,

12  888-89 (1990).

13     **B.  SECTION 1983 CLAIMS GENERALLY**

14          In order to prevail on a claim under 42 U.S.C. § 1983, a plaintiff must show that (1) the

15  conduct complained of was committed by a person acting under color of state law, and that (2)

16  the conduct deprived a person of a right, privilege, or immunity secured by the Constitution or

17  laws of the United States.  *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other*

18  *grounds, Daniels v. Williams*, 474 U.S. 327 (1986).  Section 1983 is the appropriate avenue to

19  remedy an alleged wrong only if both of these elements are present.  *Haygood v. Younger*, 769

20  F.2d 1350, 1354 (9th Cir. 1985), *cert. denied*, 478 U.S. 1020 (1986).

21          In order to maintain a claim under 42 U.S.C. § 1983, a plaintiff must set forth the specific

22  factual bases upon which he claims each defendant is liable.  *Aldabe v. Aldabe*, 616 F.2d 1089,

23  1092 (9th Cir. 1980).  Vague and conclusory allegations of official participation in civil rights

24

1    violations are not sufficient to support a claim under § 1983. *Ivey v. Board of Regents*, 673 F.2d

2    266 (9th Cir. 1982). A defendant cannot be held liable under 42 U.S.C. § 1983 solely on the

3    basis of supervisory responsibility or position. *Monell v. New York City Dept. of Social Services*,

4    436 U.S. 658, 694 n.58 (1978); *Padway v. Palches*, 665 F.2d 965 (9th Cir. 1982).

5    **C. SECTION 1983 CLAIMS FOR DAMAGES AGAINST DEFENDANTS MARK
     STRONG AND BILL VAN HOOK IN THEIR INDIVIDUAL CAPACITIES AND
6    DEFENSE OF QUALIFIED IMMUNITY**

7            Defendants in a Section 1983 action are entitled to qualified immunity from damages for

8    civil liability if their conduct does not violate clearly established statutory or constitutional rights

9    of which a reasonable person would have known. *Pearson v. Callahan*, 129 S.Ct. 808, 815

10   (2009) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In analyzing a qualified

11   immunity defense, the Court must determine: (1) whether a constitutional right would have been

12   violated on the facts alleged, taken in the light most favorable to the party asserting the injury;

13   and (2) whether the right was clearly established when viewed in the specific context of the case.

14   *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

15           1.      Violation of Fourteenth Amendment Right?

16           The Fourteenth Amendment protects a civil detainee's right to safe conditions of

17   confinement. *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016). In order to

18   sustain a Fourteenth Amendment claim regarding their conditions of confinement, the Plaintiffs

19   must show:

20           (a) The defendant made an intentional decision with respect to the conditions
             under which the plaintiff was confined;

21
             (b) Those conditions put the plaintiff at substantial risk of suffering serious harm;
22
             (c) The defendant did not take reasonable available measures to abate that risk,
23           even though a reasonable officer in the circumstances would have appreciated the

24

ORDER ON MOTION FOR SUMMARY JUDGMENT - 13

high degree of risk involved—making the consequences of the defendant's conduct obvious; and

(d) By not taking such measures, the defendant caused the plaintiff's injuries.

*Castro* at 1071.

Particularly in light of the Ninth Circuit Court of Appeals holding in *Jones v. Special Commitment Center, et. al.,* 644 Fed. Appx. 721 (9th Cir. 2016), in which the court considered the water quality claims at the SCC, the Plaintiffs here have raised issues of fact as to whether Strong and Van Hook violated their Fourteenth Amendment rights by "subjecting [them] to punishment." *Jones* at 721.  They have made an adequate showing on each of the four *Castro* elements, as follows:

### a.  Intentional Decision

The Plaintiffs have shown that there are issues of fact as to whether Defendants Strong and Van Hook made intentional decisions with respect to the provision of water at the SCC.  The record contains evidence that indicates that these Defendants knew that brown water events were occurring and that there were issues with the water at the SCC but, other than occasional, temporary fixes (provision of water bottles, for example), decided to allow use of the tap water for drinking, cooking, and washing (both people and clothing), and failed to address the basic issues until 2022.

### b.  Conditions Put the Plaintiffs at Substantial Risk of Serious Harm

There is sufficient evidence in the record, if believed by a fact finder, that the water at the SCC put the Plaintiffs at substantial risk of suffering serious harm.  For example, Dr. Corey opines that the drinking water in the past (1985-2020) at the SCC had "occasional exceedances of chemicals during the years of sampling" and "chemicals that were routinely elevated above guidance and reporting levels."  Dkt. 191 at 1.  A December of 2014 testing of the water system

1    revealed a primary drinking water regulated contaminant, a TTHM, that exceeded the allowable

2    limit.  Dkt. 181 at 4.  Again, federal primary drinking water regulations are standards that have

3    been implemented to protect public health.  Dkt. 181 at 3.  Moreover, a June 8, 2016 test

4    revealed that the level of manganese exceeded the standards set.  Dkt. 181 at 4; 181-2 at 2.  Dr.

5    Corey contends that the EPA's health advisory level "for manganese is health-based and is based

6    on an analysis of the health hazard and aesthetic concerns with manganese consumption."  Dkt.

7    191 at 3.  Further, October 26, 2020 testing demonstrated that one of the HAA5s "exceeded the

8    EPA Maximum Contaminant Level Goal . . . in five of the six sampling locations."  Dkt. 191 at

9    1-2.  According to Dr. Corey, exceeding a Maximum Contaminant Level Goal "increases the

10   potential for adverse health effects."  *Id.* at 2.  The Plaintiffs have pointed to sufficient issues of

11   fact as to whether the water conditions at the SCC put them at substantial risk of suffering

12   serious harm.

13                  *c.   Failure to Take Abatement Measures*

14          "With respect to the third element, the defendant's conduct must be objectively

15   unreasonable, a test that will necessarily turn on the facts and circumstances of each particular

16   case."  *Castro* at 1071 (*cleaned up*).  The plaintiff must prove more than negligence and instead

17   something akin to reckless disregard. *Gordon v. County of Orange*, 888 F.3d 1118, 1125 (9th

18   Cir. 2018).

19          There are issues of fact as to whether Defendants Strong and Van Hook's abatement

20   decisions regarding the water were objectively unreasonable.  They were aware of years of

21   ongoing issues with the water quality.  They knew that SCC residents and staff reported that the

22   water tasted badly, smelled foully, stained clothes, and on occasions was "as dark as coffee."

23   They were aware that the water had debris and floating sediment in it and that the staff brought

24

water to drink from off the island.  Even though the Defendants contend that they handed out bottled water during the scheduled flushing events, according to the Plaintiffs, sometimes during brown water events no bottled water was handed out and the amount that was given for a day, one or two 16.9 ounce bottles, was not enough.  The Plaintiffs contend that they were expected to drink, cook, and wash with that amount of bottled water.  The water system was renovated and came online in the fall of 2022, apparently solving the issue.  Other fixes were attempted, but trouble with the system was apparent at least by 2013 and continued until the fall of 2022, based on the evidence in the record.  The Plaintiffs were and are people detained on an island with no other way to get water.  There are issues of fact as to whether Defendants Strong and Van Hook took reasonable actions to abate the risks to the Plaintiffs.

### d.  Harm to the Plaintiffs

There are issues of fact as to whether the Defendants Strong and Van Hook's failure to act caused harm to the Plaintiffs.  The Plaintiffs complain of various health issues related to the water including gastrointestinal upset and skin issues.  Dkt. 93.  Dr. Quinn opines that the drinking water system was "substandard and via many routes of exposure, SCC residents and staff were exposed to contaminants and elements which, on a more probable than not basis, caused subacute and chronic adverse health consequences . . . including stomach ailments, skin rash and skin irritation," as well as the physical, mental and emotional injuries as alleged in Plaintiff's Amended Complaint.  (*See* Dkt. 82, paragraphs 4.70, 4.21, 4.23 and 4.27.)

The Plaintiffs' showing is sufficient to carry the issue of violation of the 14th Amendment, under *Castro*, forward to trial.

### 2.    Clearly Established?

1    Defendants Strong and Van Hook claim that summary judgment should be granted

2 because they are entitled to qualified immunity.  As to the second *Saucier* step, the Court must

3 determine whether the constitutional rights asserted were "clearly established when viewed in the

4 specific context of the case." *Saucier* at 2156. For purposes of qualified immunity, "[a] right is

5 clearly established when it is sufficiently clear that every reasonable official would have

6 understood that what he is doing violates that right." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7

7 (2021). While case law directly on point is not required for a right to be clearly established,

8 "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*

9 at 7-8. This inquiry "must be undertaken in light of the specific context of the case, not as a

10 broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).  Courts in the Ninth

11 Circuit look to "controlling authority or a robust consensus of cases of persuasive authority to

12 determine settled law."  *Vanegas v. City of Pasadena*, 46 F.4th 1159, 1165 (9th Cir. 2022).

13    The Defendants' motion for summary judgment should not be granted based on qualified

14 immunity.  Defendant Strong moved for qualified immunity in the *Jones* case on August 22,

15 2014.  *Jones v. Special Commitment Center, et. al.,* U.S. Dist. Court for the Western Dist. of

16 Wash. case number 3:14-cv-5018 BHS, Dkt. 25.  A judge granted summary judgment for the

17 Defendants in that case.  *Id.* at Dkt. 40.  On March 3, 2016, the Ninth Circuit Court of Appeals

18 reversed the district court's decision as it related to water quality claims at the SCC, finding that

19 Jones raised issues of "material fact as to whether Strong violated his Fourteenth Amendment

20 rights by subjecting him to punishment."  *Jones v. Special Commitment Center, et. al.,* 644 Fed.

21 Appx. 721 (9th Cir. 2016).  The right of detainees to good water is clearly established.

22

23

24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

### 3.   Conclusion

The Defendants' motion for summary judgment on the Plaintiffs' Fourteenth Amendment claims for damages (Dkt. 176) should be denied.  There are issues of fact as to whether the Plaintiffs' Fourteenth Amendment rights were violated and Defendants Strong and Van Hook are not entitled to qualified immunity.

**D.  SECTION 1983 CLAIMS FOR DAMAGES AGAINST THE STATE, DSHS, AND MARK STRONG AND BILL VAN HOOK IN THEIR OFFICIAL CAPACITIES**

The Plaintiffs assert claims for damages against the State of Washington, DSHS, and Mark Strong and Bill Van Hook in their official capacities.  The Defendants move for summary judgment on those claims.

States, state agencies, and officials acting in their official capacities are not "persons" and so are not subject to a suit for monetary relief under § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)(holding that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983"); *Maldonado v. Harris*, 370 F.3d 945, 951 (9th Cir. 2004)(noting that state agencies are not "persons" for purposes of § 1983, and are therefore not amenable to suit under that statute).

The Defendants' summary judgment motion to dismiss all § 1983 federal constitutional claims for damages asserted against the State of Washington and the DHSH, and all individual Defendants in their official capacities, to the extent such claims are made, (Dkt. 176) should be granted.  There are no issues of fact and these Defendants are entitled to a judgment as a matter of law.  The § 1983 claims for damages asserted against the State, DSHS, and the individually named Defendants in their official capacities should be dismissed with prejudice.

1

2

### E.  CLAIMS FOR PROSPECTIVE RELIEF AGAINST STRONG AND VAN HOOK IN THEIR OFFICIAL CAPACITIES

The Plaintiffs assert claims for prospective injunctive relief against Mark Strong and Bill Van Hook in their official capacities.  The Defendants move for summary judgment on those claims.

### 1.  Strong

The Defendants' motion for summary judgment on the Plaintiffs' claims against Mark Strong, in his official capacity, for prospective injunctive relief only (Dkt. 176) should be granted.  Strong is no longer an official at the SCC and cannot provide the Plaintiffs with prospective injunctive relief.

### 2.  Van Hook

A state official sued in their official capacity for prospective injunctive relief is considered a person under § 1983 because "official-capacity actions for prospective relief are not treated as actions against the State."  *Will* at 71, n. 10.

Van Hook is currently the SCC's CEO official and so is considered a "person" for Plaintiffs' claims for prospective injunctive relief for the purpose of § 1983.  *Will* at 71, n. 10.

To the extent that the Defendants argue that the Eleventh Amendment bars the Plaintiffs' claims for prospective injunctive relief against Van Hook, the Plaintiffs properly point out that the doctrine announced in *Ex parte Young*, 209 U.S. 123 (1908) applies.  "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective."  *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland*, 535 U.S. 635, 645 (2002).  The Plaintiffs here contend that their Fourteenth Amendment rights have been violated due to the water quality at the SCC.  They

1    seek an order forcing Van Hook, acting in his official capacity as the CEO of the SCC, to cease

2    violating their Fourteenth Amendment rights to clean water.  The Eleventh Amendment does not

3    bar the Plaintiffs' claims for prospective injunctive relief against Van Hook.

4         The next issue to be considered, however, is whether the Plaintiffs have pointed to

5    sufficient issues of fact on their claims for prospective injunctive relief against Van Hook.  The

6    prospective injunctive relief that they seek is an order that Van Hook cease violating their

7    constitutional rights.  Dkt. 82.

8         The parties do not agree on whether a claim for future harm is available under *Castro.*

9    Assuming, without finding that it is available and that *Castro* supplies the proper test, the

10   Plaintiffs' claim for prospective relief should be dismissed.  There is no evidence in the record

11   regarding the conditions that now exist, particularly after the system was redesigned and made

12   operational in November of 2022.  Accordingly, there is no evidence that the current drinking

13   water conditions put the Plaintiffs "at substantial risk of suffering serious harm," or that actions

14   by Van Hook in the future relating to the water quality will cause the Plaintiffs' injuries.  *Castro*

15   at 1071.  They have not shown that there are issues of fact as to their claim for prospective

16   injunctive relief.

17        The Defendants' motion for summary judgment on the Plaintiffs' claims for prospective

18   injunctive relief only against SCC CEO Van Hook, in his official capacity, (Dkt. 176) should be

19   granted.

20   **F.  CONCLUSION**

21        The Defendants' motion for summary judgment (Dkt. 176) should be granted, in part, and

22   denied, in part.  The motion should be denied as to the Plaintiffs' Fourteenth Amendment claim

23   for damages against Defendants Strong and Van Hook, in their individual capacities, and denied

24

as to Defendants Strong and Van Hook's claim of qualified immunity.  Defendants' motion should otherwise be granted.

The Plaintiffs acknowledged at oral argument that there was no evidence in the record regarding water quality after the new water system was operational on November 18, 2022. Trial should proceed on Plaintiffs' claims occurring within the statute of limitations period to November 18, 2022.

### III.   ORDER

Therefore, it is hereby **ORDERED** that:

- The Defendants' Motion for Summary Judgment (Dkt. 176) **IS:**
  - **DENIED** as to the Plaintiffs' Fourteenth Amendment claim for damages against Defendants Strong and Van Hook, in their individual capacities, and **DENIED** as to defendants' claim of qualified immunity and
  - **GRANTED** as to Plaintiffs' Eighth Amendment claims, claims against the State of Washington, DSHS, and claims for prospective injunctive relief.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

Dated this 22nd day of August, 2023.

ROBERT J. BRYAN
United States District Judge